IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TERRENCE D. HOLDEMAN, and the class of similarly situated individuals and entities,<br>Plaintiffs,<br><br>vs.<br><br>MICHAEL W. DEVINE, et al.,<br>Defendants. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Case No. 2:02-CV-00365 PGC |

This matter came before the court for a bench trial on September 6-8, 2005. Plaintiff was present and represented by Brian S. King of King, Burke & Schapp. Defendant Michael W. Devine was also present and was represented by Michael W. Homer of Suitter Axland.

**BACKGROUND**

This class action lawsuit was brought by the class representative on behalf of a group of employees who worked at the State Line Hotel & Silversmith Casino in Wendover, Nevada and their dependents. All members of the class were participants in or beneficiaries of State Line's Employee Benefit Plan who submitted medical claims to the plan for services provided between May 1, 1999 and December 8, 2001, which remain unpaid or underpaid up to the present day. While both parties acknowledge that the plan began to face funding problems early on and that

these funding problems ultimately resulted in underfunding of the plan, the parties disagree as to whether defendant, Michael W. Devine, as President and CEO of the plan's sponsoring entities, breached his fiduciary duty to the class under the Employment Retirement and Income Security Act ("ERISA") and thus, should be held civilly liable to the plan for any resultant losses.

**FINDINGS OF FACT**

After reviewing the trial testimony, the documentary evidence, and the parties' pre- and post-trial briefs, the court now enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

From 1958 through 1991, all of the State Line related operations in Wendover, Nevada were family-owned by Anna Smith and her four children: Marian Barnwell, Billie Ann Smith Devine, Mary Carol Johnson, and James W. Smith.[1]

During the time frame at issue in this case, State Line Hotel, Inc. primarily owned the State Line Hotel, operated restaurants, and ran the slot operations for State Line Casino.[2] It also acted as the administrative company for the State Line entities.[3] State Line Casino was a closely-held partnership of Anna Smith's four children and owned the table games and the pit area and was the primary pass-through entity for receipt of income for the partners.[4] The other primary

---

[1]Trial Tr., Vol. I at 50.

[2]*Id.* at 51.

[3]*Id.*

[4]*Id.* at 51-52.

entity during this time period was Jim's Enterprises, Inc., which owned the Silver Smith Casino.[5] All of these entities were closely held either in corporate form or in partnership.[6]

The State Line entities had for many years maintained a self-funded employee benefit plan.[7] The plan's funding was derived both from the funds of the employer and contributions made by the covered employees.[8] The self-funded plan was arranged such that claims would be paid by the companies as they came in. If an individual claim was above a certain dollar amount, anything above that amount would be covered by re-insurance.[9] According to the credible testimony of Michael Devine, the choice was made to go with a self-funded plan because it was less expensive than a group insurance policy.[10]

Plaintiff and all class members were covered under the State Line & Silver Smith Casino Resorts Employee Benefit Plan, which became effective on May 1, 1999.[11] Like previous employee benefit plans, this plan was self-funded.[12] The original Summary Plan Description ("SPD") for the plan was inconsistent in its identification of who the plan administrator was.

---

[5]*Id.* at 52.

[6]*Id.*

[7]Trial Tr., Vol. I at 58-59.

[8]*Id*. at 61.

[9]*Id*. at 58.

[10]*Id*. at 60.

[11]Ex. 1, p. 55.

[12]*Id.*

The document first identifies State Line & Silver Smith Casino Resorts as plan administrator,[13] but later in the same document names Michael Devine as plan administrator and as fiduciary of the plan.[14] The third-party administrator for the plan was identified in the original SPD as MGIS companies.[15] On May 1, 2001, the plan was amended, and this time, only State Line Hotel, Inc. and Affiliated Entities were identified as the plan administrator and named fiduciary of the plan.[16] The plan commencing May 1, 2001, terminated not long after, in December of 2001.[17]

Michael W. Devine is the son of Billie Ann Smith Devine and had worked as an attorney at the well-regarded Salt Lake City Law Firm of Parsons, Behle & Latimer before being asked by the professional advisors of the State Line entities to consider helping out the family business in late 1997 or early 1998.[18] Mr. Devine came in at the tail end of a major expansion project the entities had undertaken and testified credibly that when he joined the companies, he was met with millions of dollars in potential litigation arising from construction disputes as well. In addition, the entities had already breached their expansion loan covenants, with the result that the banks that had loaned the money were threatening foreclosure.[19]

---

[13]Ex. 1, p. 54.

[14]*Id.* at 58.

[15]*Id.* at 59.

[16]Ex. 21, p. 66.

[17]Trial Tr., Vol. I at 103-04.

[18]*Id.* at 47-48, 50.

[19]*Id.* at 62-63.

Mr. Devine began working for the plan's sponsoring entities as Executive Vice President and General Counsel in January of 1998.[20] Among his primary duties in this post were recruiting new managers and resolving the legal issues with the banks.[21] Thus, Mr. Devine was involved in negotiating a forbearance agreement with the banks in 1998 that allowed the entities to go on operating and avoid foreclosure.[22] Mr. Devine also recruited Mac Potter to become CEO of the companies.[23] In August of 1999, Mr. Devine became President of the companies, but his official duties remained unchanged.[24] However, in April of 2000, at the urging of the banks' crisis manager, Mr. Devine was appointed as President and CEO of the sponsoring entities.[25] Mr. Devine did not receive any increase in salary upon becoming CEO.[26] Over this entire time period, the entities had to report monthly to the banks and would have surprise inspections by bank auditors, attorneys, and CPAs to make sure that all agreements with the banks were being

---

[20]Trial Tr., Vol. I at 69; Trial Tr., Vol. II at 54.

[21]Trial Tr., Vol. I at 70; Trial Tr., Vol. II at 60.

[22]Ex. 8; Trial Tr., Vol. I at 69; Trial Tr., Vol. II at 61.

[23]Trial Tr., Vol. I at 76.

[24]Trial Tr., Vol. II at 54-55.

[25]Trial Tr., Vol. I at 76; Trial Tr., Vol. II at 80.

[26]Trial Tr., Vol. II at 82.

adhered to.[27] Other amendments to the credit agreement were subsequently made during the time period at issue in this suit.[28]

Mr. Devine had some involvement with the medical benefits plan back when he joined the companies in 1998. He was at least aware when he came on board that there were some funding problems with the plan, although he was not integrally involved in dealing with these problems at that time.[29] At some point after joining the companies, Mr. Devine suggested that the companies do competitive requests for a proposal for a third-party administrator of the plan.[30] He worked with Mac Potter and Linda Sweat to find a plan that employees would deem just as good but would save the companies money.[31] Changing to a fully-insured group plan was considered, but seemed too expensive for the companies at the time.[32] Ultimately, the entities chose MGIS as the third-party administrator of a new incarnation of the medical benefits plan that commenced on May 1, 1999.[33] Through MGIS, the State Line plan received access to network discounts with various healthcare providers in the area.[34] To be entitled to these

---

[27]*Id.* at 73.

[28]Exs. 27, 28, 29, 30.

[29]Trial Tr., Vol. I at 88.

[30]*Id.* at 78-79, 82.

[31]*Id.* at 84.

[32]*Id.* at 90-92.

[33]Ex. 1; Trial Tr., Vol. I at 88.

[34]Trial Tr., Vol. I at 81.

discounts, State Line had a number of obligations, including timely payment to medical providers.[35]

Between January of 2000, and the ultimate termination of the plan in December of 2001, a number of amendments to the plan were made which Mr. Devine signed.[36] Mr. Devine testified that before he became CEO in April of 2000, he did not have a great deal of discretion as to how the plan was administered.[37] He also testified that upon becoming CEO, he was ultimately responsible for the extent to which the plan received funds from the sponsoring entities,[38] although he left that day-to-day and weekly funding decisions on how much was paid to the medical claims to the financial people,[39] primarily Leon Flinders, who came in to the business as CFO in February of 2000.[40] Mr. Devine testified that from May of 1999, he did consider himself a fiduciary of State Line's medical benefits plan.[41]

At the end of January 2000, the financial people at the companies found $300,000 in additional medical claims that had not been paid by the companies.[42] This adjustment was in

---

[35]*Id*.

[36]Ex. 21; Trial Tr., Vol. I at 105-07.

[37]Trial Tr., Vol. I at 108.

[38]*Id*. at 109.

[39]*Id*.

[40]*Id*. at 121.

[41]*Id*. at 114.

[42]*Id*. at 122.

addition to the medical expenses the companies already had.[43] Mr. Devine found this to be alarming as well as incompetent and it is, he believed, one reason that the banks' crisis manager urged that a new CEO be put in change.[44] Before becoming CEO in April of 2000, Mr. Devine did not regularly meet to discuss administration of plan funding problems,[45] although he was vaguely aware of them and had been told by one employee, Linda Hamilton, of a delay in payment.[46] He never told CEO Mac Potter or anyone else that the plan had to be funded before any commercial creditors were paid because he believed that the companies had to pay both and that these responsibilities were competing. He believed (quite credibly under the circumstances) that if commercial and secured creditors were not paid, the companies might not be able to stay open.[47] Mr. Devine, as a fiduciary of the plan, never considered bringing suit against the sponsoring entities to force adequate funding of the plan.[48] (If any such suit had been filed, it would have rapidly led to the dissolution of the State Line entities, with the likely effect of immediately terminating the plan.)

---

[43]Trial Tr., Vol I. at 127.

[44]*Id*. at 122.

[45]*Id*. at 124-25.

[46]Trial Tr., Vol. I at 126; Trial Tr., Vol. II at 77-78.

[47]Trial Tr., Vol. I at 129-30.

[48]*Id.* at 135-37.

Once Mr. Devine became CEO, he began meeting weekly with all of the executive directors.[49] Underfunding of the plan became a regular topic of conversation at these meetings, as well as at the meetings of the Board of Directors, because the arrearages were really having an impact on the business and the employees.[50] According to the credible testimony of Leon Flinders, at the time he came on with State Line, the companies had about a $1.2 million liability on the books for medical claims.[51] In addition to medical plan arrearages, the companies were hundreds of thousands of dollars in arrears to other vendors.[52] Mr. Devine never told the owners that they had to give priority to funding the plan ahead of payment to commercial creditors, but the evidence demonstrates that under his leadership as CEO, the entities did become much more aggressive in paying the medical claims.[53] In fact, between February and October of 2000, $1.2 million went to payment of past due medical claims such that by October of 2000, the companies had managed to "zero out" their liabilities to medical providers. Unfortunately because of an unfavorable business climate for casino gambling (aggravated by significant reduction in air travel following the September 11 terrorist attacks), this situation did not last. By the time the

[49]Trial Tr., Vol. I at 124; Trial Tr., Vol. III at 11.

[50]Trial Tr., Vol. I at 137.

[51]Trial Tr., Vol. III at 22.

[52]Trial Tr., Vol. I at 150.

[53]Ex. 3, p. 3; Trial Tr., Vol. I at 139; Trial Tr., Vol. II at 12-13; Trial Tr., Vol. III at 45.

plan terminated in December of 2001, the liability for medical claims had worked itself back up to around $1.1 million.[54]

Mr. Devine testified credibly that when he became the CEO, he gave funding of the plan greater priority, but that he "did not believe that it was exclusive to the ruination of the company."[55] The companies began focusing on growing the "top line" so that there would be income to pay all expenses–including medical expenses.[56] In fact, in the year 2000, the entities' doubled their cash flow which allowed them to pay down the arrearages.[57] At the weekly executive meetings, Mr. Devine was informed of where the business was in terms of cash on hand, and how much needed to be paid to whom, including medical claims;[58] but on a day-to-day basis, he left Mr. Flinders in charge of deciding the right balance in terms of who would get paid.[59] Generally, all company obligations were considered at these weekly meetings, not just obligations regarding the medical plan.[60] Very occasionally, Mr. Devine would direct a priority payment of a particular medical claim, specifically in the situation where a medical provider was

---

[54]Trial Tr., Vol. III at 46, 49.

[55]Trial Tr., Vol. I at 140.

[56]*Id*. at 150-51.

[57]Trial Tr., Vol. II at 12-13, 85-86, 93.

[58]Trial Tr., Vol. III at 11-12.

[59]Trial Tr., Vol. I at 153.

[60]Trial Tr., Vol. I at 154; Trial Tr., Vol. III at 15.

threatening to cut off serving the companies' employees or to stop giving discounts.[61] Apparently, however, this situation did not arise very often.[62] As a general matter, the testimony credibly established that the entities would pay first whatever was required to keep the doors open and the companies operating and then turn aggressively to the medical claims.[63]

The testimony also established (and the parties really do not dispute) that all employee contributions to the plan were forwarded immediately into a separate plan account.[64] Originally, beginning in May of 1999, the plan's third-party administrator, MGIS, processed all claims and issued all payment checks to providers.[65] Sometime in 2000, this process changed, and instead of issuing the checks directly to providers, MGIS forwarded the payment checks to State Line for State Line to keep until adequate funding was available, at which point State Line itself would release the checks.[66] MGIS would forward the checks to State Line once or twice a month, with each installment usually numbering in the dozens.[67] State Line's policy, once it became responsible for disbursement of the payment checks, was that claims would be paid on a first-in,

---

[61]Trial Tr., Vol. I at 152, Trial Tr., Vol. III at 16, 18-20.

[62]Trial Tr., Vol. I at 152.

[63]*Id.* at 184.

[64]Trial Tr., Vol. II at 28; Trial Tr., Vol. III at 18.

[65]Trial Tr., Vol. II at 29-30.

[66]Trial Tr., Vol. II at 30; Trial Tr., Vol. III at 10.

[67]Trial Tr., Vol. III at 14.

first-out basis.[68] Even with the "first-in, first-out" policy in place – a policy mandated by the Department of Labor ("DOL")[69] – this policy was not always strictly complied with, particularly if stop-loss limits were about to be exceeded or if network discounts were being threatened.[70]

Between May of 1999 and December of 2001, a time when the plan was underfunded, a number of distributions were made to the owners of the sponsoring entities beyond their salaries in a total amount of approximately $1,245,000.00.[71] The entities also made charitable contributions during this period.[72] The testimony established that the distributions to the partners of the entities were for payment of personal federal income taxes both on profits and on estate tax payments on the estate of Anna Smith.[73] Anna Smith's estate consisted solely of the companies that were the sponsoring entities.[74] Sometime around 1997, the Internal Revenue Service ("IRS") revalued the estate, at which time the partners ended up with an additional estate tax liability.[75] The banks signed off on the distributions to the partners, largely out of concern that the partners, who were the owners of the sponsoring entities, and also guarantors on some of the loans, not get

---

[68]Trial Tr., Vol. II at 35.

[69]Trial Tr., Vol. II at 36.

[70]*See* Ex. 3; Trial Tr., Vol. III at 18-20.

[71]Ex. 6; Trial Tr., Vol. I at 158.

[72]Ex. 6; Trial Tr., Vol. I at 158; Trial Tr., Vol. III at 27.

[73]Ex. 8, p. 4; Trial Tr., Vol. I at 173; Trial Tr., Vol. II at 70, 72-73, 141-42.

[74]Trial Tr., Vol. III at 6.

[75]Trial Tr., Vol. I at 173; Trial Tr., Vol. II at 141.

cross-wise with the IRS and have enforcement actions brought against them, which could have threatened the continued viability of the companies.[76] Credible evidence also established that the partners did not see any of the money from these distributions; the money instead went directly to the IRS.[77] As for the charitable contributions, 99.9% of these represented group discounts and packages, for organizations and charities such as the Elks Club. These "charitable" contributions provided the companies with great promotion and marketing at a grass roots level and contributed to the continued success of the business.[78] In other words, they were not purely "charitable" contributions but might be generally viewed as business-related marketing expenses.

During the time period at issue in this case, in addition to the backlog of medical claims, State Line had a number of other expenses that had to paid so that it could stay in business. These expenses included monthly gaming taxes, which, if not paid, would lead to the casinos being shut down immediately.[79] Payments were due on slot machine agreements – including payments on the machines themselves as well as daily machine rental fees and revenue percentage payments. The companies had built up a debt of about $700,000 to food vendors, which then began requiring payment on delivery. Payroll had to be met during this period, and it was always paid. FICA and payroll taxes had to be paid regularly, and the companies had insurance payments and property tax payments as well. Some monies had to go to advertising to

---

[76]Trial Tr., Vol. I at 161, 168, 170, 181; Trial Tr., Vol. II at 71-73, 141.

[77]Trial Tr., Vol. II at 142.

[78]*Id.* at 95-96.

[79]*Id.* at 87.

keep the companies going and to the costs of maintaining and, when required, updating the properties.[80]

The DOL began an investigation into State Line's underfunding of its medical plan in February of 2001[81] after the third-party administrator of the plan, MGIS, reported the plan-funding problems to the DOL.[82] While the investigation was opened and Mr. Devine was ultimately informed that of the DOL's concerns he had violated ERISA's duty of loyalty, duty of prudence, and duty to refrain from prohibited transactions,[83] no formal enforcement action was ever taken, even though the DOL continued to monitor State Line.[84] The testimony established that the companies fully cooperated with DOL's investigation, and Mr. Devine, who dealt directly with the DOL on the action, credibly testified that he felt like DOL recognized that the companies were doing everything they could to fund the plan, even though it was not happy with the pace.[85]

In 2001, however, revenues began to trend downward again, and State Line was resigned to having to either refinance or sell some of the properties.[86] In July of 2001, Mr. Devine

---

[80]*Id.* at 92-94.

[81]Exs. 12, 19.

[82]Ex. 9; Trial Tr., Vol. II at 7.

[83]Exs. 12, 14.

[84]Trial Tr., Vol. II at 22.

[85]*Id.* at 21-24, 83, 101, 118-19.

[86]*Id.* at 98.

realized that State Line would not be able to make their interest payment to the banks on the loans, so he went to the individual partners and asked them to lend whatever personal monies they could to State Line so that the loan agreements would not be breached.[87] Marian Barnwell could not afford to loan money to State Line,[88] but Billie Ann Devine lent $200,000 by cashing out her personal 401(k) account.[89] Mary Carol Johnson also cashed out her personal 401(k) account and lent State Line $255,393.63.[90] Eve Louis Smith, the wife of partner Jim Smith, lent State Line $460,000 by taking money out of her personal Schwab Investment Account.[91] Only $5000 of this amount was ever repaid to Eve Louis Smith.[92] These monies were used for principal and interest payments.[93] Then the September 11 terrorist attacks occurred, and gambling revenues declined even further.[94] On November 6, 2001, State Line's PPO network, terminated the discount arrangement it had with MGIS.[95] As a result, State Line's third-party administrator, MGIS, sent a letter to Mr. Devine on November 8, 2001, informing him that

---

[87]*Id*. at 101-104.

[88]Trial Tr., Vol. III at 58.

[89]Trial Tr., Vol. II at 131; Trial Tr., Vol. III at 58.

[90]*Id.*

[91]Trial Tr., Vol. II at 144-45.

[92]*Id.* at 143.

[93]*Id.* at 105.

[94]*Id.* at 103, 106-07.

[95]Ex. 15, Trial Tr., Vol. I at 108.

MGIS was terminating its agreement with State Line.[96] Based on this notification, State Line terminated the plan.[97] As of December 1, 2001, the companies had switched to a fully-funded group plan that offered fewer benefits.[98] Finally, because they were facing foreclosure by the banks, the companies filed for Chapter 11 bankruptcy protection on January 10, 2002.[99] In the bankruptcy, a reported $970,706.44 was left outstanding in unpaid medical claims.[100]

Terrence D. Holdeman is one of the named plaintiffs with medical claims that were left unpaid by State Line. From 1999 to 2001, Mr. Holdeman's wife was a pit boss at State Line and he was covered under her medical benefits plan.[101] Sadly, Mr. Holdeman incurred approximately $60,000 in medical expenses with the University of Utah that went unpaid by State Line despite repeated calls to State Line and to the third-party administrator.[102] The University of Utah referred the $60,000 in unpaid claims to collections, and Mr. Holdeman has yet to pay this off as of the date of trial.[103]

---

[96]Ex. 15.

[97]Ex. 16; Trial Tr., Vol. II at 41, 108.

[98]Trial Tr., Vol. II at 41-42.

[99]Ex. 17; Trial Tr., Vol. I at 171.

[100]Ex. 7; Trial Tr., Vol. II at 57.

[101]Trial Tr., Vol. I at 14.

[102]*Id.* at 15-17.

[103]*Id.* at 18.

Like Mr. Holdeman, Gerald Anderson also had trouble getting his medical claims paid by State Line. Between 1999 and 2001, Mr. Anderson worked as director of slots for both Silver Smith and State Line, and his wife worked there as well, until about two years prior to State Line's bankruptcy.[104] Sadly, the Andersons accumulated approximately $10,000 to $15,000 of unpaid medical claims that should have been covered under State Line's medical benefits plan but which they ended up paying themselves by charging it on their credit cards.[105] Mr. Anderson spoke with company representatives on several occasions, and although they never outright promised him that the claims would be paid, he was definitely left with the impression that the companies were going to pull out of their financial difficulties and were going to be able to meet their obligations, including payment of his family's covered medical expenses.[106]

Ruth Ann Wilson is another former employee of the State Line Casino who worked for the companies from 1979 to 1982 and then again from 1984 until February of 2002.[107] She held a number of positions at the Casino, including pit supervisor and was a participant in State Line's medical benefits plan.[108] Sadly, as of December of 2001, Ms. Wilson was left with approximately $25,000 of medical expenses that the plan failed to pay.[109] Because of problems

---

[104]*Id.* at 29-30.

[105]*Id.* at 30-31; 39-40.

[106]*Id.* at 32, 35, 37.

[107]Trial Tr., Vol. II at 148.

[108]*Id.* at 148-49.

[109]*Id.* at 149.

with State Line's funding of the plan, Ms. Wilson's husband was required to submit $15,000 in cash to the hospital and doctor in advance or they would not perform a needed back surgery on him.[110] The Wilsons used money from an inheritance and from their savings account to make this prepayment and the plan never paid them back.[111] Ms. Wilson went to the Human Resources Department ("HRD") on numerous occasions, as well as to Leon Flinders and even once to Mr. Devine in an attempt to get her bills paid.[112] Other employees also contacted the HRD, Leon Flinders, and Michael Devine (on occasion) to inquire and/or complain about their unpaid medical claims.[113] HRD informed Ms. Wilson that there was nothing they could do, there was no money and nothing was being paid.[114] Ms. Wilson had the impression that of the checks that the companies did release for payment of her claims, they were never released in any order.[115] Ms. Wilson also recalled that at one point a bill of one of the partners was placed on the desk of Linda Sharp in HRD and that Ms. Sharp was told to pay it right away because the owners had to be taken care of.[116] Ms. Wilson did ultimately admit, however, that she was not in court to testify that she had any comprehensive view about how the companies handled the paying of unpaid

---

[110]*Id.* at 150-52.

[111]*Id.* at 152.

[112]*Id.* at 154-62.

[113]Trial Tr., Vol. II at 114.

[114]*Id.* at 153.

[115]*Id.* at 157.

[116]*Id.* at 163.

medical claims.[117] No financial evidence of any favoritism towards the owners has been produced.

For his part, Michael Devine does not deny speaking to company employees regularly regarding their unpaid medical claims. He freely admitted during his testimony that he informed inquiring employees that the companies wanted to pay everything but that he could not guarantee promptness of payment.[118] Sometimes, Mr. Devine testified, he would counsel employees to speak to the providers themselves and to try to work out something directly with them, as this was the only practical, immediate solution he could offer them.[119] Finally, the evidence established that the owners of the sponsoring entities were also left with unpaid medical claims,[120] as was Mr. Devine.

**CONCLUSIONS OF LAW**

Initially, the court acknowledges the very real hardships that the plaintiffs and the class members suffered as a result of the events giving rise to this lawsuit. It is clear from credible testimony in this case that employees were forced to scavenge their savings to pay off their medical debts. Some are still struggling to pay off medical debts to this day. However, as much as the court regrets what plaintiffs and class members have been forced to go through over the past several years, based on the above findings of fact and application of the relevant law, the

---

[117]*Id.* at 165.

[118]*Id.* at 114-15.

[119]*Id.* at 115.

[120]Trial Tr., Vol. II at 109; Trial Tr., Vol. III at 58-59.

court nonetheless concludes that Mr. Devine did not breach his fiduciary duties to the plan or the plan participants under ERISA.

Mr. Devine conceded at trial that he was a fiduciary of the State Line medical benefits plan at all times relevant to this suit. Thus, the only legal determination left to make is whether, under the facts as found by the court above, Mr. Devine breached any of his fiduciary duties to the plan or the plan participants under ERISA. Plaintiffs' position in this trial is that Mr. Devine breached the fiduciary duties imposed on him by ERISA – specifically, the duty of loyalty,[121] the duty of prudence,[122] and the duty to refrain from engaging in prohibited transactions – by not prioritizing the funding of the plan and by authorizing distributions to the owners and charitable contributions at a time when the plan was underfunded.[123] Mr. Devine maintains, on the other hand, that all of the complained-of actions he took during the relevant time period were business and not fiduciary decisions, and that although they may have had an adverse impact on the ERISA plan, they are not actions that are regulated under ERISA.

Last May, the Tenth Circuit handed down *In re Luna.*[124] *Luna* includes a lengthy and detailed discussion of the issues that arise when a fiduciary of an ERISA is also an employer.[125] Thus, the Tenth Circuit expressly affirmed that in ERISA cases:

---

[121]29 U.S.C. § 1104(a)(1)(A).

[122]29 U.S.C. § 1104(a)(1)(B).

[123]29 U.S.C. § 1106.

[124]406 F.3d 1192 (10th Cir. 2005).

[125]*See id.* at 1207.

> [B]usiness decisions must not be confused with fiduciary actions. It is well-established that an ERISA *fiduciary* can 'wear two hats,' meaning an individual can be both an employer and a *fiduciary*."[126]

Because an individual, like Mr. Devine in this case, can be both an employer and an ERISA fiduciary, a court's inquiry in a case alleging that such an individual breached his fiduciary duties under ERISA must initially focus on "whether the alleged fiduciary 'was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to the complaint.'"[127] As the Tenth Circuit recognized:

> Because virtually every business decision an employer makes can have an adverse impact on an employee benefit plan, courts must 'examine the conduct at issue to determine whether it constitutes management or administration of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary duties.'"[128]

And even when decisions are made that personally benefit the employer, this does not necessarily constitute a breach of fiduciary duty to an ERISA plan, because such decisions can still be characterized as purely "business" and not "fiduciary" in nature.[129]

Plaintiffs contend that the Tenth Circuit's discussion in *Luna* is not governing here because *Luna* only dealt with the issue of whether the Lunas were ERISA fiduciaries in the first

---

[126]*Id.* (citing *Amato v. Western Union Int'l, Inc.*, 773 F.2d 1402, 1417 (2nd Cir. 1985)) (emphasis added).

[127]*Id.* (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)).

[128]*Id.* (quoting *COB Clearinghouse Corp. v. Aetna U.S. Healthcare, Inc.*, 362 F.3d 877, 881 (6th Cir.2004), *cert. denied*, 125 S.Ct. 271 (2004)) (internal citation omitted).

[129]*See id.* (citing *Izzarelli v. Rexene Prods. Co.*, 24 F.3d 1506, 1523-25 (5th Cir.1994)).

instance. But this still does not avoid the import of *Luna*. Instead, *Luna's* discussion of the analysis to be applied in cases where an individual is *both* an employer and an ERISA fiduciary is directly on point with the present case. The court will thus follow *Luna* and determine whether the actions Mr. Devine took as an executive and ultimately the CEO of State Line were purely business decisions, not regulated under ERISA, or whether they were decisions taken in his fiduciary capacity under ERISA.

A review of all the facts in this leads the court to conclude that all of the actions taken by Mr. Devine, from the time he joined the companies in 1998, and during the time period relevant to this lawsuit, are properly characterized as business and not fiduciary decisions. The facts establish that State Line was facing very serious financial problems during the entire time Mr. Devine was with the companies. In the court's view, the evidence clearly shows that Mr. Devine's decisions throughout this time period were exclusively focused on keeping the companies from going under. Failure to fully fund the plan, the court finds, was not a result of breach of fiduciary duty to the plan or plan participants, but rather to the pragmatic business decisions Mr. Devine was forced to make in difficult financial circumstances in order to prevent foreclosure or bankruptcy. For example, if Mr. Devine had failed to pay commercial creditors during this time, it is clear that this could have shut down important aspects of the companies' operations. Had Mr. Devine not prioritized payment of secured creditors, the banks would have foreclosed on the properties. Gaming taxes, property taxes, wages, and insurance costs also had to be paid and were essential to the continued viability of the companies.

It is true that as a result of some decisions made by Mr. Devine, the plan was not fully funded during his tenure at the companies. Mr. Devine, however, did the best he could. In fact, the evidence shows that Mr. Devine made attempts to be as aggressive as possible under the circumstances in funding the plan. Employee contributions were always forwarded to the plan account and at one point, the companies had even managed to zero out its outstanding liabilities to the plan. Even as revenues again declined in 2001, the companies continued to fund the plan to the best of its abilities in light of other obligations that were critical to keeping the business up and running. Mr. Devine's decisions regarding funding of the plan were thus not "fiduciary" decisions in any respect, but rather business decisions made to save the companies from bankruptcy — a bankruptcy that would have obviously hurt all the plan participants immediately.

The court also finds that Mr. Devine's authorization of distributions to the owners and of charitable contributions during this time period also constituted business, and not fiduciary, decisions. The court is satisfied that the distributions to the owners went directly to the IRS; had the owners had problems with the IRS, this could have threatened the companies, as the owners were personal guarantors on the loans from the banks. That the banks signed off on these distributions plainly bolsters this conclusion. Moreover, the only reason for the tax liability was that the owners had inherited the properties. It was unusual timing to have a later reassessment of the value of the estate and allowing payment of the taxes from the estate itself (that is, from the properties) was fair and appropriate under the circumstances. The court is also mindful of the fact that these distributions may have also "personally" benefitted the owners. But the owners

themselves made significant sacrifices in order to save the companies at a time when foreclosure was imminent. Thus, for example, two of the owners completely emptied their own personal 401(k) retirement accounts to save the companies. And that as a result of the business' ultimate failure, very little of this money was ever repaid. As for the charitable contributions, it seems clear that the companies needed to increase its revenues in order to avoid failure. The charitable contributions at issue were more in the nature of marketing expenditures. They, too, were reasonable business decisions under the circumstances.

In spite of Mr. Devine's best efforts, the companies were ultimately forced to file bankruptcy in 2002. The court has no doubt that the events of September 11, 2001, and the impact of those events on the tourist industry at large, played a large role in State Line's failure. To suggest now in hindsight, however, that decisions made by Mr. Devine which were intended to save the companies from completely going under constituted "fiduciary decisions" and breaches of his fiduciary duties under ERISA because they adversely affected funding of the plan seems clearly incorrect. Instead, the court finds that Mr. Devine's actions constituted purely business decisions not regulated by ERISA and, because the decisions were not fiduciary or made by Mr. Devine in his fiduciary capacity, that Mr. Devine did not breach his fiduciary duties to the plan or plan participants under ERISA.

**CONCLUSION**

Accordingly, the Clerk of Court is directed to enter judgment in favor of defendant, Michael W. Devine. The Clerk of Court is further directed to CLOSE this case.

DATED this28th day of October, 2005.

BY THE COURT:

Paul G. Cassell
United States District Judge